Court will proceed to the second case of the day, Fabick v. JFTCO, Inc. Ms. Dettmer. Good morning, Your Honors. May it please the Court. My name is Kathleen Dettmer, and I'm the attorney for the plaintiff appellant, Fabick, Inc. Fabick appeals from a jury verdict in its favor in the face of the District Court's denial of a meaningful remedy, which effectively transferred ownership and control of the trademark from the owner to the infringer. The District Court committed reversible error when it left the injured markholder without the remedy that equity demands. It did so despite the undeniable presence of what this Court has called the most corrosive type of harm a markholder can suffer, a complete loss of control over one's goodwill and reputation. Denying a meaningful remedy is denying the right itself. Here, the Court declined to provide an effective remedy for two reasons, both of which constitute manifest errors of fact and law. First, the fact that Fabick, Inc. did not identify John Fabick Tractor Company's use of the name in Missouri and Illinois back in 1994 when it originally applied for the trademark, well before that name came into use in Wisconsin and the Upper Peninsula of Michigan. Second, and probably more importantly, the Court found that Fabick was not harmed by the infringement. In fact, the Court twice held that Fabick benefited from the defendant's infringement. In doing so, the Court applied the wrong legal standard to determine that a disclaimer was an acceptable remedy, and then it compounded that error when it ordered relief so limited that it failed entirely to address the harm the defendants caused and ceded control of the mark to the infringer. Fabick was not harmed by the infringement. Why do you think that those products count at all for purposes of Fabick's infringement? Well, Your Honor, I think that that is just one aspect of many which show that the products that issue in this case from both Fabick, Inc. and JFTCO are complementary products. So the Versaflex product, which Your Honor is referring to, is just one aspect of Fabick, Inc.'s business, which is a direct competitor with Fabick's Pore Pack product. But that's just one slice of the pie here, because the reality is that there is so much actual confusion in this case, in large part because these products are interrelated. They are complementary. And this Court and many other courts have held that where products are complementary, the likelihood of confusion is dramatically increased. And that's exactly what we see in this case with the overwhelming amount of actual confusion that's present here. I'm not sure I fully understand that argument. Well, if Your Honor is asking why the Versaflex product is relevant to the issue of confusion, what I'm indicating is that the evidence at trial showed that when someone walks into a Fabick Rents business, which is the rental arm of JFTCO's Caterpillar Rental business, there is an industry alliance with Lincoln Contractor Supply. And both of these businesses came together to offer products that aimed at precisely the same type of market that Fabick, Inc. markets its own products to. Small-time contractors, people that own pickup trucks. So if someone will walk into that business and see a competitive product to one of Fabick, Inc.'s products. But again, that's just one tiny part of why these products are complementary and why these products are relevant. Because the complementary nature of them naturally leads to the finding of confusion that the jury clearly found in this case. Well, I mean, now you're saying a tiny part. Whereas in the briefs, it certainly seemed to me that you placed a lot of weight on that fact, which, you know, I'm not sure is relevant. Yeah. Okay. Ms. Dedman, were any of these issues about use of the family name covered in the corporate transactions that created Fabick, Inc. and then spun it off from the other family operations? Yes, Your Honor. There was a stock purchase agreement that was executed in 1997 with the transfer of Fabick, Inc.'s stock to J. Fabick, 100 percent of the stock. In those documents, the intellectual property rights were specifically transferred as part of the transaction. But there was no reservation on the part of the sellers to the family name? No, Your Honor. Nothing specifically anticipating this kind of feud that's developed?  Let me ask you what I think troubles me most about the case. The general rule after a finding of infringement would, of course, involve the kind of injunctive relief that you're asking for. But as I understand the law and the relatively authoritative teachings of Professor McCarthy in this area, when the mark is a family name or a personal name, it's not a family name. It's much more common to find relief in the form of much more limited compromise injunctions with disclaimers, with notices, so that both people with the family name can use the family name. Well, I think there's a couple of issues there, Your Honor. First of all, this isn't just a family name common law trademark where you have families using the name in the realm of their business. This is a registered trademark that was registered by the predecessor in interest of J. F. Tico and transferred, hook, line, and sinker, to my client with full exclusive rights to use that name. I would also draw the Court's attention to the fact that John Fabick Tractor Company, which is the parent company of J. F. Tico, has significantly changed their use of that name over time and expanded their use of that name in both product lines and territory. So once a trademark holder obtains the registered mark, and even if there is a possible or apparent senior user somewhere in the United States, the boundaries of that senior user's ability to use the mark in commerce are solidified. The Iron Curtain basically descends around— Well, I think here the fact that this is a registered trademark is dispositive of the issue of the validity of the mark and the ability of my clients to have the exclusive use of it. I don't think that the family name issue should drive the outcome here because this is a mark that was created and obtained in due course by the very same people that are now trying to take it back. I'd like to follow up on Judge Hamilton's question to you because I have the same concern. And given the common origin of these companies and the prior use of the Fabick name by the John Fabick Tractor Company, why would it not at least be within the district court's discretion to reject an injunction precluding the defendant from using the Fabick mark? Because the Lanham Act requires the district court to remedy the harm. And with the significant and pervasive amount of actual confusion that's present in this case that only began after John Fabick Tractor Company's subsidiary, JFTCO, began using the Fabick name in Fabick's primary territory of Wisconsin and the Upper Peninsula of Michigan, that is when the infringement occurred. That was the infringing action. Now, the district court's equitable remedy requires that it remediate the harm and that it substantially reduce or address the issue of actual confusion. I mean, this court and many courts... Do you think it was at least foreseeable to the plaintiff that John Fabick Tractor Company and its subsidiaries might one day want to use the Fabick name? In Wisconsin and the Upper Peninsula, particularly given its history of sales in that market, however limited they might have been? I don't think in this case, Your Honor, because the reality is that the Caterpillar business in Wisconsin and the Upper Peninsula of Michigan was dominated by the name Fabco. And there had been no indication until the very late months of 2014 and into 2015 that these companies were going to use the Fabick name. These two businesses would ever come back together. I don't think that that was a consideration. Moreover, as J. Fabick testified, back when this mark was applied for in 1997, John Fabick Tractor Company was using the name John Fabick Tractor Company. That's how we knew it. That's how everybody knew it. It wasn't until the mid-2000s when they started using the name Fabickat. And that name, we would argue, is not actually the same continuing... Does not create the same continuing commercial impression between John Fabick Tractor Company and Fabickkat. So I think those fundamental changes are what drove the confusion and drove the infringement in this case, not some idea that J. Fabick or Fabick, Inc. could possibly predict that some of the companies would be using the name John Fabick Tractor Company. I think it was some 15 years after the mark was applied for that there would be a fundamental change in circumstances that would drive the depth and breadth of confusion that was present in this case. I think it's also important for this court to recognize that the district court heavily relied on the district court's position that the infringement in fact benefited my client. There is no support in trademark law or anywhere else for the concept that a plaintiff can benefit by being the victim of trademark infringement. And it's clear from the district court's opinion that that heavily influenced his position in ordering the limited notice disclaimer that we have present in this case. By trying to, by indicating that there was no harm to Fabick, Inc. by virtue of the infringement, and by rejecting the idea that actual confusion is evidence that can and should substantiate harm by substantiating the loss of control that Fabick, Inc. has suffered, I think the district court committed an error of both fact and law. In this case, there's actually far more actual confusion and far more evidence of displeased customers and of the same kinds of problematic effects that we see in trademark cases in this district where courts have ordered injunctions. If the court looks at the International Kennel Club case, for example, where this court found not only that an injunction should issue, but specifically rejected the idea of the disclaimer in the face of significant actual confusion. And in the International Kennel Club case, which is the one where the International Kennel Club of Chicago sued to prevent a stuffed toy dog manufacturer from using the International Kennel Club name on its stuffed toy dogs, in that case there was far less actual confusion than there is in the instant case. And what this court found is that a plaintiff's reputation should not be forever dependent on the reputation of the infringer. Moreover, it's irrelevant really what the reputation of the infringer is. The quality of the goods is irrelevant. This is because... Let's go back to the notices and disclaimers. I mean, because I understand the point you're making about the limits of notices and disclaimers as a remedy. But given that the plaintiff and the defendant don't really sell the same products under the FABIC name, why wouldn't a remedy focused on steering vendors, suppliers, customers to the appropriate company, why wouldn't that be a legitimate remedy? Well, there's a couple of issues there, Your Honor. First of all, the only evidence in the record about the effectiveness of the remedy ordered by the district court is that it doesn't work. So we already know that reaching out to vendors and customers and contacting them, in writing, over the phone, in person, at trying to educate JFTCO's own employees about the differences between these two companies, we already know that that remedy doesn't work. The evidence in the record made that clear. And we go back then to the mandate that the district court's order actually remedy the harm at issue in this case. In addition, the remedy at issue here isn't even really a true disclaimer. This is more like an occasional notice system, because most of the time the general public and the consuming public is going to come in contact with the FABIC name. It's going to be by the benefit of JFTCO, because they are massively larger in size than FABIC, and spend millions more dollars in affiliating their products with our name. But that most of the time, because of the limits on the remedy that was issued, the public is not going to see a JFTCO from FABIC Inc. and FABIC Inc.'s products. We also have to grapple with the five-year sunset provision that the court ordered. At the end of the five years, there's literally nothing that is stopping what the jury in this case has already found is trademark infringement. So from that point going forward, FABIC Inc. has essentially lost all control, all ownership, and all benefit from its name and its registered mark. And that, again, goes against the requirement that the remedy actually address the harm at issue in this case. Economic harm is not required. Lost sales is not required. The concept of a trademark is essentially the embodiment of reputation, the embodiment of reputation and goodwill, and the loss of control of that is the harm. That is the most corrosive type of harm, and that is the harm that is present in this case. And unlike many cases where injunctions are routinely ordered, this case is unique in the amount and the wide variety of actual confusion that's present in the case. Has that continued? Yes, Your Honor. It has continued. Up to the trial? Up to the trial. I thought there was like an initial burst. No, Your Honor. Excuse me. No, go ahead. No, Your Honor. The amount of confusion remained pretty consistent from the time of July 1, 2015 when the name changed and through trial. It had continued unabated at that point. And that is despite the continued efforts of FABIC, Inc., and some efforts by John J.F. Tico, including the 3x5 index cards, which the court ordered to be present by the phone of people answering the phone, talking to the employees, talking to the vendors and the customers. All of that was happening during the two years that this case was pending, and the confusion continued unabated. One other aspect of these appeals, Ms. Dedman, has to do with your claims for damages. One measure, apparently you were seeking profits. Were you seeking all of the defendants' profits? Your Honor. Were you specific? I'm sorry. Can you repeat the question, please? Were you seeking all of the defendants' profits, and where did you get specific about the damage theory and amounts you were pursuing? Well, what FABIC, Inc. did in terms of damages prior to summary judgment was what the Lanham Act required, and that was to submit data of J.F. Tico's profits. And then J.F. Tico then submitted a corollary expert report that effectively reduced what they thought was profits attributable to the use of the mark. It never really was permitted to get any further than that because the damages issue was dismissed at the summary judgment stage, and we believe that that was an inappropriate exercise of discretion on the part of the court. And, of course, this court reviews that decision de novo. But at the summary judgment stage, FABIC, Inc. had done everything that the law requires it to in order to substantiate its claim for damages of defendants' profits. Now, the district court summarily dismissed the ability to obtain defendants' profits based upon an extremely narrow definition of unjust enrichment. And that was really the only rationale the court offered on that point, which is contrary to case law in this circuit, which holds that in both the Sands case and the Rulo v. Russ case, both of which indicate that the scope of rationale for obtaining defendants' profits is not nearly so narrow as the district court indicated in this case. There are multiple rationales for the- The district court was obviously very frustrated in its efforts to get you all to identify damages theories and calculations. What am I overlooking in the record? Well, I think what you're overlooking in the record, Your Honor, is that in terms- FABIC, Inc.'s primary damages request theory and remedy was the standard theory and remedy that we always see, which is a disgorgement of defendants' profits. FABIC, Inc. timely and properly disclosed all that was required, including the amount of those profits, and then also included a significant amount of evidence from which the court could infer other rationales for disgorging defendants' profits, including potential evidence of bad faith, deterrence, and the like, all of which were summarily dismissed at the summary judgment stage without any development of the fact or of the facts that are associated with the potential for deterrence or the evidence of bad faith that was present in the record. Ms. Devon, you sought additional time after trial, right, for- to develop damages? Your Honor, we did seek additional time after trial because on the third day of trial, the court indicated that it would be open to determining damages based upon a reasonable royalty. That was not a damage theory that the plaintiff had sought previously. We had essentially sought the defendant's profits remedy, which was dismissed at summary judgment, and of course summary judgment wasn't issued until just a few weeks before trial. So at that stage, based upon the court's openness to looking at that issue, we did request additional time to submit that evidence, and the court denied that request. On the theory it should have been developed earlier, what was the district court's reasoning? The district court essentially held that the- that on the last day of trial was the equity phase of trial because the jury had come back in favor of the plaintiff. And so the court found that the evidence had to be present that day, even though the court had just indicated two days earlier that it wanted to hear evidence on that point. Now, from a practical perspective, Favikink believed that it should have been- provided additional time to give evidence on those damages, in large part because there would have been no prejudice to either side or to the defendants in allowing that. The court's order on this case was issued about 15 months after trial, so there would have been plenty of time to get an additional 30 to 60 days to put in an expert report on a reasonable royalty. It was just a limited inquiry that Favikink was asking for, really just based upon the court's order from two days prior. If I may, I would like to- Oh, go ahead, Your Honor, I apologize. I just was going to say that, you know, given the corporate history involved, coupled with what the judge believed to be a lack of evidence, that Favikink lost any sales by virtue of Fabco's name change to Fabicat, I've had a difficult time seeing any error, legal or otherwise, in the district court's decision to preclude an award of the defendant's profits at the summary judgment stage. The error at summary judgment in terms of defendants' profits. Well, I think that the point there is that the court's dismissal of defendants' profits in its decision was based entirely on the court's narrow interpretation of unjust enrichment as it applies to cases like this. But the law of this circuit is not nearly that narrow.  by plaintiffs in trademark cases in order to make infringement unprofitable for defendants, in order to deter unlawful conduct, and based upon the idea that unjust enrichment is not some narrow idea, but the idea that a trademark is a property right and that the defendants have essentially used Favikink's property without its permission and without accounting for the benefit.  Surely. Thank you. Mr. Vatter-Tweak. Thank you, Your Honor. May it please the court. Given the long-standing prior use by the John Favik Tractor Company of the Favik name, and the fact that the mistakes featured at trial are not prohibitive of the reverse confusion issue  we believe that the jury got it wrong and the district court erred in not granting our motion for judgment as a matter of law. But putting that aside, the district court entered an order and a judgment with a very targeted, sustained injunction. It was limited, but it was targeted and it was sustained at the types of mistakes that he saw featured at trial. The district court enjoys broad discretion in these kind of equitable determinations, and he did not abuse his discretion in entering this order. But I'd like to start with the cross-appeal issues, if I may, especially the prior use issue and the reverse confusion issues that we've raised. And the reason for that is threefold. One is that, obviously, if you rule in my client's favor on those issues, the other issues regarding the relief are moot. Two, and I think more importantly, is that the district court's order, this court's denial of our judgment as a matter of law on the prior use issue and the reverse confusion issue is irreconcilable with this circuit's controlling precedent or it opens up issues that the district has not yet had a full opportunity to weigh in on. And finally, importantly too, I think the facts that underlie these two issues weigh heavily into the district court's equitable determination that has been challenged in the main appeal. So I think it's a worthwhile exercise to focus on cross-appeal issues during my time. Starting with the prior use issue, Congress has given a very broad defense for prior users of marks, even when that mark is incontestable under the Lanham Act. And all you have to do is prove the requirements under 15 U.S.C. Section 1115b-5. And those requirements are that the accused mark must, one, be adopted without knowledge of the registrant's prior use, and two, that mark has to be continually used by the defendant or a party in privity with the defendant from a date prior to the date that the registration was applied for. Here, the facts show that both of those elements are clearly met. The John Faber Tractor Company has been in business for over 100 years at this point. It celebrated its 75th anniversary of doing business nationwide and internationally in 1993. Counsel? I understand this, and in your brief, you went through, in essence, your case, your affirmative case on this defense in great detail. What I found, frankly, a little frustrating was that I didn't see in your opening brief engagement with the district court's rationale for denying the JMOL. And I think it would be most helpful if you could address those rationales. Sure. You obviously thought that you had quite strong evidence on that point but identified a number of respects in which plaintiff had managed to at least on the pejorative would be throw dust in people's eyes and the jury came out against you. So I think you really need to address those rationales. Sure. And this is at Appendix 6 through 8 is his order on this issue. I think if you contrast the standard that this court announced in the S.C. Johnson case, particularly at page 666 of that case, there this circuit addressed the 1115B-5 prior use issue and noted a few important things. And I think if you juxtapose page 666 of the S.C. Johnson case with what the district court did, the error becomes quite clear. This court said that this is a totality of the circumstances test. It's not a market penetration test. We look at all the different items of evidence. Evidence of sales is not necessary to establish ownership.  There's a website, which there was in this case, that bears a trademark and is used in connection with the goods. Notably, this court said that ownership and notoriety are two different things. You don't have to prove wide public recognition. You cite to a case that said a single use in trade may sustain trademark rights if followed by continuous commercial utilization. So the bar for the prior use defense is quite low. It's basically bona fide use in commerce of the mark. Now if we turn to the district court's analysis, starting on Appendix 6, he first notes that the evidence that was presented at trial of prior use is your honor dead. It was persuasive and strong. But then he goes into kind of the gripes, I should say, that the plaintiff had with the evidence. You had sales records. First of all, we had undisputed testimony that sales happened in Wisconsin. They happened with invoices that had the FABIC mark. There were proposals sent to customers in Wisconsin. Gerald Grothy, an employee since 1975, testified that he was up there using the mark. So we have all this undisputed evidence of actual bona fide use of the FABIC mark in the relevant geographic territory. But the district court said, well, plaintiff at trial poked holes in that evidence. In other words, yeah, you had spreadsheets that showed the itemized sales and it was a Bill 2 address of Wisconsin, but, you know, on cross, plaintiff's counsel poked some holes on whether or not the SHIP 2 address was actually Wisconsin or it was somewhere else. We pointed out in our briefing, I believe, that it doesn't really matter because you had a Wisconsin-based customer that was receiving an invoice and was engaged in commercial activities with John FABIC Tractor Company and saw on the top of the invoice the FABIC mark. So there was commercial use of that mark regardless of where the machine was shipped for the jury, thought that there were some holes in that, and the court thought that was effective too. I feel like this is me trying to get into the amusement park ride where you have to be 48 inches to ride the ride, and I come in and I ask the guy, can I ride the ride? And he says, well, how tall are you? I say, I'm over 6 feet tall. Well, you're wearing shoes. Well, but I'm way over this mark here. Well, you know, where's your evidence from the doctor that shows how tall you are? That's the frustration I've had in this case is that the threshold that this circuit has announced for what you must show to prove prior use defense is way below the evidence we had at trial in the geographic region. Second, page appendix 6 of the district court's analysis, he criticizes the fact that, you know, this construction equipment that you sell to these contractors in the pipeline business is sort of a niche market. But the court's opinion in S.C. Johnson shows that, you know, limited market, that's not the relevant consideration. We don't have to prove that Joe Blow off the street who would have no use for a piece of heavy equipment would recognize the FABIC name. Of course that's not the market penetration in the general public is not the test. So I think the judge erred when he criticized our evidence on that basis. And then I think most critically, and I think this is what happened at trial, and the judge made the same error on pages 7 and 8 of the appendix, is that in closing argument, and we tried to keep this evidence out because we think it's completely irrelevant, but they said that the appropriate segment of the market, in other words, market penetration test, should be measured by what the local Caterpillar dealer was doing in hundreds of millions of dollars in sales and advertising. And that was the bar. They said that's the appropriate segment of the market. The jury adopted that rationale and said, yeah, but compared to them, we paled in comparison. That, of course, is not the test. And the judge, the district court judge, in appendix 7 and 8, found that to be a persuasive argument and found that given the narrow niche markets in which John Fabry Tractor Company operated, he agreed with that argument. And that's just the incorrect legal standard, and there's, I think, manifest legal error that this evidence, which the judge found abundant and strong, did not. I would like very much, please, to talk to you about the likelihood of conviction and the jury instruction and the addition of the somehow connected language. I realize that that language comes from R. Sand's case, but I am always suspicious of importing opinion language into jury instructions. Here, the somehow connected language, to me, seems awfully broad and somewhat vague. Isn't there a real danger that the jury's focus was diverted from the central issue of confusion? Yes, Your Honor, absolutely, I believe that to be the case. We recognize that the Sands case said somehow connected to. We believe that it was related to the source of the products, but regardless, it could be the case that in certain circumstances the somehow connected to standard is appropriate. But certainly when you're dealing with a case with these facts, where you have members of the same family using the surname in different businesses, a shared history where one of the parties came out of a corporate history related, where the public knew that they were related, the somehow connected to language was particularly problematic, and I think it infected the jury's verdict that we can't tell whether the jury thought the somehow connected was, oh, I saw Fabic, I wonder if they're connected to the Fabics that run the other company. In fact, one of the pieces of evidence they rely on is a LinkedIn message where I believe it was some sort of career coach or something like that had met Liz Fabic at some sort of seminar. She said, I drove past the dealership, my client's dealership, and I thought of our conversation. So Fabic, oh, I wonder if they're related. So I agree with Your Honor that this is particularly problematic in this case. I'd also like to address, since we're talking about likelihood of confusion, just generally the likelihood of confusion issue in the evidence that was featured at trial. Here, because there was really no hint of folks thinking that the big bulldozers and heavy machinery that my client sells were somehow sourced from plaintiff. So the plaintiff early on abandoned, rightly so, I think, the idea of a direct confusion and went to a reverse confusion standard. So we tried to keep out the evidence, again, at trial of some of this 200-some instances of wrong numbers because it's not probative of the reverse confusion. So in the reverse confusion scenario, they had to prove that the likelihood of confusion is the source and origin of their product. In other words, folks think that their products are somehow coming from my client's business. The evidence featured at trial, and I won't go through all the factors because I think the critical factor here, and it's pretty evident, that the reason why we lost this issue at trial is because they had 200-some instances of what they called actual confusion. But these instances were vendors of my client, customers of my client, employees of my client, mistakenly calling Fabic Inc. thinking that they were reaching my client's number. So certainly there was no confusion. This has no probative value as to whether or not there was confusion as to the source or origins of a plaintiff's product. These were folks looking to talk to a JFTCO employee about a JFTCO product or in some instances, for example, there was one of my client's employees called trying to log in remotely to the website and trying to get the help desk at my client. So these instances, although certainly carried the day at trial, are simply not probative of the reverse confusion issue. And second, and I think more important, is when you look at these cases and you're citing the cases from the 1990s and then back in the 70s, and those cases cite the cases from the 50s, I think we have a situation here where the precedent has not kept up with technology. So you have to ask yourself, when you tick through the likelihood of confusion factors, it's like the marks aren't similar, there's a famous cat mark in colors, and you go through the whole thing, no one's going to confuse a bulldozer and a coating and sealant. Then why in the world, when actual confusing evidence is so rare, the courts note that it's rare to find that, why do we have 200-some instances in this case? And I would submit that it's because it's not actual confusion. These were situations of carelessness or inattentiveness in this information age. In the age when you can pull the cell phone out of your pocket and say, call Faye McGink, Siri, and she pulls something from somewhere and the phone rings at the wrong place, or when you do a quick Google search and it pops up with two numbers and somebody pokes on their phone and pokes the first one that pops up, that is carelessness and inattentiveness in a day of an information age where everyone's fast, fast, fast, fast. We have misdirected payments in this case where the invoice that they were paying, so the commercial transaction is complete. They did business with the proper party, now they're trying to pay their bill. The accounts payable clerk has an invoice that says, remit payment to Faye McCat at this address. In the old days, some accounts payable clerk would probably pull up a typewriter, type in the address on the envelope, type up the check, and it would go to the right place. We wouldn't even be here, but today there's the autofill functionality where an accounts payable clerk starts typing Faye Mc, the computer fills it up, fills out the check, it goes into an envelope and it goes out the door. They don't even think twice about whether or not there's an affiliation between the two companies. So I think there's a lag between where technology has taken us in the information age and the actual confusion type analysis. There's a couple of cases that have addressed this. One is the Thermoscan case in the Sixth Circuit that we cited, and there's a Duluth case from the 90s in the Eighth Circuit that we cited, and they clearly distinguish a situation where you're dealing with inattentiveness or carelessness, they distinguish that from Lanham Act actual confusion or anything that's probative of likely confusion. The Thermoscan case expressly noted that in this Internet age, somebody could have mistakenly typed in thermoscan instead of thermoscan. In our case, it's even more likely that there's going to be an error because if you start typing Faye Mc and hit enter, Faye Mc, Madison, Wisconsin, hit enter, you're going to get results for both companies, and inattentiveness can lead to calling the wrong company. So I think that there's an opportunity for the circuit to provide some guidance in this information age that there's a difference, and we really have to dive, we have to go beneath the surface to try to figure out what was causing these wrong number calls. In this situation, we have a package that was addressed, and this is part of their account, there was a package addressed to Fabco, the prior name, Fabco Equipment in Green Bay, Wisconsin, and they Googled the wrong address, and they got Faye Mc, Inc.'s address in Madison, Wisconsin, and sent the package to Madison, Wisconsin. When Faye Mc, Inc. answers the phone and says, you've reached Faye Mc, how can I help you? They're looking for Caterpillar Equipment. When they say, oh, we're a coatings and sealants business, half the time they laugh and apologize and hang up. So it's clear, when you dig below the surface of the fact that the phone's ringing with the wrong number, when you dig below the surface, there is no probative relevance of this evidence, and it doesn't show actual confusion. So Faye Mc did identify some joint customers that were confused. Isn't that true? It's true that there are some customers that called Faye Mc, Inc., looking for JFTCO to talk about JFTCO's products, that happened to also be a customer for Faye Mc, Inc. But I don't think that's probative of a customer thinking that Faye Mc, Inc.'s coatings and sealants products were somehow sourced from the Caterpillar dealership down the street. And to go back to Your Honor's question about the family history and how that can be a problem when you have somehow connected to, they had two witnesses that were third parties at trial. One was Lisa Parks. And Lisa Parks works for Unlimited Decorating. They buy spray foam, chemical-type stuff from Faye Mc, Inc. and from us. They rent Faye Mc, Rents. They rent the lifts. She had, for like three different transactions, sent the checks to the right place. Then one time, autofill problem, Faye Mc, it types Faye Mc on the check, but it was sent to our client at Faye Mc, Rents. So, again, this was an autofill problem. She testified that she attributed the location, she's about a half mile away from Faye Mc, Inc., her location at her business location. She testified that when she drove past there, she thought Faye Mc, Inc. was affiliated with Faye Mc, Rents. But later on cross-examination, she admitted that she thought Faye Mc, Rents was still Fabco. So in her mind, when you put the two together, in her mind there's this corporate history where Faye Mc, Inc. used to be a subsidiary of Fabco. In her mind, they're one and the same. So this is confusion that's sourced from this prior corporate history. She thought it was Fabco. The Dun & Bradstreet is another instance. That could have been the source of the problem, too. It says 100% of the stock of Faye Mc, Inc., according to Dun & Bradstreet, is owned by John Faye Mc Tractor Company. Well, that's false. But back in the day, it was owned 100% by Fabco. Another part of the Dun & Bradstreet report says that it leases its property from Fabco Equipment. Well, that's old information. So who knows how many folks are looking at Dun & Bradstreet that are making these mistakes. But it's clear to me that there's nothing here that's probative of trademark confusion. To address briefly the profits issue on the main appeal, with regard to the late request to reopen damages discovery in order for them to get an expert to opine on a royalty, I think it's important that the court brought this up. The court, to his credit, was being very deferential and not wanting to stop them from getting any kind of monetary remuneration. But they never presented him with a Plan B. So when he came up with the idea, well, there might be some sort of monetary. For example, the Sands case talks about a royalty. At Record 374, pages 12 to 13, is where he apologizes for any confusion. He says, this is a district court judge. I'm just responding. I'm sorry. The court said, I didn't mean to mislead you. If there was some basis for it, meaning the royalty, I would consider it. But then he goes on and says, in every case I've ever had, plaintiffs came with proof of liability and damages, which was your obligation. So I don't know on what basis I would reopen damages. So there's really no basis in the record when they had an opportunity to pursue profits and as a fallback position have a royalty theory and as a fallback position have some other theory. But they chose not to do that. So under Rule 26A, it was not an abuse of discretion for the judge to say, we're at trial, we're not going to have a do-over here. Counsel, I'm concerned about a couple of aspects of the district court's decision. One is this emphasis on the theory that your client's use of the FABIC name benefits the plaintiff, which I find hard to reconcile with what trademark law I know. The second thing that concerns me, take the liability finding as a given, take the injunction, the narrow injunction with notices and disclaimers as sufficient. Why should there be a time limit on that injunction? Sure. Taking the first question. So the district court, although it mentioned the fact that it benefited FABIC, it's clear that that's not what drove his decision. If we look at Appendix 16, well, let's look at Appendix 14. You'd agree with me that that's difficult to find in trademark law? Yes, I believe that that's true. This case is a little unique, and I'll get to that in a minute, in that there was some residual past where they benefited from an association. I don't know if he was referring to that. But Appendix 14, he cites two reasons why the plaintiff's request for a sweeping injunction is not warranted. First, defendants submitted substantial undisputed evidence that applying for the FABIC trademark, they were aware of the risk. That was the main reason. He goes on to add a little color about the benefit, but the main reason was you went into this and you chose the FABIC surname knowing full well that there was another business out there. Jay FABIC, the president of FABIC, Inc., used to work for John FABIC Tractor Company, was aware of the sales nationwide, worked himself on pipeline stuff that went to Wisconsin, was well aware of the fact that there was a use in Wisconsin of the FABIC name. That's undisputed evidence. So that was the primary driver. He threw in the color of the benefit. And then the second factor that the court says, and that says the second, the court considered this at Appendix 16. Second, the court considers the nature of the harm at issue here, as well as the relationship between the harm and the scope of the injunction. So those were the two things. He weighed the equities here. I don't think it was a driving factor, the fact that he thought there was a benefit here. But he found that they consciously were aware of the risk and accepted it by going forward. The second question. Time limits. Oh, time limits. Sure. So here, although Ms. Detman says that these measures to directly contact the types of folks that are making these mistakes haven't been effective, I don't think that's true. I think the record was that when folks like Lisa Parks or others learned that, oh, there's two separate companies using the FABIC surname, that they didn't get calls. The testimony was they never got a call back. So I think it is effective. As far as the sunset provision, I think once folks in the Madison area recognize that there's two separate FABIC companies that have some presence, of course there were more. There's FABIC Equipment and Lawn Care and FABIC Farm and FABIC Marketing that we cited in our brief. But there's two main businesses in the Madison area that are using the FABIC name. I think once folks are educated that that's the fact, they'll be more careful and not commit these sort of inattentive and careless mistakes. That sounds very optimistic about human nature. Perhaps so, but I'm an optimistic guy, I guess. But I think that this is the best effort to try to directly address these types of mistakes. And again, the fact that Monroe Truck, for example, so Monroe Truck was one of their featured key instances of confusion. Monroe Truck had three separate instances where they kept the accounts payable or kept sending payments to the wrong place, or maybe it was vice versa, so accounts receivable. They were told by FABIC, hey, you got the wrong place. Our client reached out and tried to fix it and said, hey, there's a separateness here. Then they called again a third time. So to me, that's indicative of the fact that these are careless and inattentive mistakes. The fact that someone continues to make the same mistake, not very many, there was a handful, but the fact that they continue to make the same mistake isn't probative of a trademark confusion where they're attributing the source of one party's products to another. It's attributed to we're moving way too fast these days, and information and misinformation is at everyone's fingertips, but that's not what the Lanham Act was designed to protect. I really don't have anything further unless anyone has questions. Apparently not. Okay. Thank you, Mr. Van Der Toerik. Ms. Dutton. Thank you, Your Honors. First, I want to start by addressing the court's concern that was raised previously about the use of a family name. Now, the case law typically requires that the infringer use the full family name, and that's what happened for the vast majority of the time that John Fabic Tractor Company was in existence. It used the name John Fabic Tractor Company, and it used it primarily in its main business areas of Missouri and Illinois. Now, here we have the infringing party doing the exact opposite, which is shortening the name into use well after the trademark owner registered and used the mark, and I think this ties in neatly with the way the actual confusion evidence proliferated in this case, which was clearly and distinctly after July 1, 2015, when the name Fabic Cat came into use in Wisconsin and the Upper Peninsula of Michigan. So I think it's important to draw those distinctions when we're talking about the use of a family name. Now, in terms of the remedying of the harm and whether or not the efforts, the previous efforts during the pendency of the litigation and how that comports with the court's order and the duty that the court has to remediate the harm, I think that the evidence is clear that, you know, and if you look at the record, this is record number 369, pages 57 through 61, this was the cross-examination of Tom Svetnicka, who was the vice president of marketing for John Fabic Tractor Company and was also instrumental in the startup of Fabic Inc. way back in the early 90s. But as Mr. Svetnicka was being questioned, it became apparent that his efforts to reach out to these vendors bore absolutely no fruit in terms of the actual confusion. Now, looking at someone like Monroe Truck, which is a joint customer, there's consistent testimony that they continuously contacted Fabic Inc. for, contacted Fabic Inc. mistakenly, and they specifically said that they assumed that we were all the same and requested that we affirmatively try harder to address what they perceived to be this continuing confusion. Now, these accounts payable and these checks sent and all of these things that Mr. Vandertag was talking about, I think that the argument that's important to understand here is that the damage in terms of loss of control and the issues with remedy draw a direct line with the harm that's caused by those kinds of confusions. So Ms. Parks of Unlimited Decorating, Fabic continuously billed her for an invoice that she thought she paid. We have customers that are calling us because JFTCO isn't paying their bills, and they're assuming that we are connected, that we are the same entity. And that kind of reputational damage, that kind of effect on goodwill, is precisely the kind of problem that the district court is obligated to remediate with once there's a verdict in the favor of the plaintiff, as there was in this case. Now, the benefit issue, you know, I appreciate Mr. Vandertag's position that this is color, but the reality is that the court mentioned this not once but twice, and further tried to support that statement by saying that there was overwhelming evidence that there was a benefit to Fabic, Inc. by virtue of the infringement. But there's no citation to the record for that statement because, of course, the only evidence in the record is that it was harmful and that the disclaimer and the notice provisions the court ordered were not effective in remediating that harm. I also want to draw the court's attention briefly to some of the key instances of confusion here that show why the attempt to educate JFTCO employees or members of the public about who these companies are simply doesn't work. We have Mr. Svetnicka who testified that there were multiple meetings with managers between 2015 and 2017 to try to address these issues, same kind of thing the court is ordering in terms of remedy. But then we have Keith Walsh of Madison Auto Trim. Madison Auto Trim is one of Fabic, Inc.'s distributors who sells its principal bedliner product. He showed up at JFTCO's headquarters, Fabic on the Beltline as he called it, and is looking for the Fabics. He wants to see the Fabics. He wants to see the people of the bedliners. And everyone at JFTCO is looking at him like they have no idea what he's talking about. There is documentary evidence of calls coming in to JFTCO with people looking for bedliner products, and they are being routed to JFTCO's parts department. They're not being sent to Fabic, Inc. These are sales that are never making it to us. They have hundreds of employees there. We have no way of actually controlling whether or not all of these calls coming to JFTCO for bedliners or similar products are actually making it to Fabic, Inc. This is the harm that's being done. This is the harm that the court was required to remediate in its order after Fabic prevailed on the trademark infringement claim in front of the jury. And you better believe that if Fabic, Inc. sold flowers for a living and someone called JFTCO asking for flowers, they wouldn't be routed to the parts department. That's because these are two companies that are engaged in complementary areas of business, and I see my time is up. Thank you. Thank you, Mr. Edmund. Thanks to all counsel. The case is taken under advisement, and the court will stand in recess for 10 minutes.